MEDICARE BENEFICIARIES' DEFENSE FUND, and Renee Zernay, Albert Klass on Behalf of Hilda Klass, and Gertrude Constantine, Plaintiffs,

v.

EMPIRE BLUE CROSS BLUE SHIELD, Defendant.

Civil Action No. CV–95–0850 (DGT).

United States District Court, E.D. New York.

Aug. 26, 1996.

Cardozo Bet Tzedek Legal Services, New York City, for Plaintiffs.

Kelley Drye & Warren, New York City, for Defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge:

Plaintiffs are an advocacy organization for Medicare recipients and three elderly persons who are or were at the pertinent time enrolled in group health insurance provided by defendant Empire Blue Cross and Blue Shield as the result of their own or their spouses' employment while they (or their spouse) were working for an employer with twenty or more employees. The individual plaintiffs, Renee Zernay,[1] Albert Klass (on behalf of his deceased wife Hilda), and Gertrude Constantine, are proposed representatives of a class consisting of:

> All Medicare eligible individuals who incurred or will incur medical expenses while working, or at a time their spouses were working, in groups covered by the Medicare Secondary Payer Program:

---

[1]. When this motion was filed, it included a request for an individual preliminary injunction on behalf of plaintiff Zernay. Since that time, however, Zernay's previously unpaid claims have been settled, and, accordingly, plaintiff withdrew that request. Plaintiffs Klass and Constantine did not ask for a preliminary injunction because "their individual financial circumstances [were] less urgent than those of Mrs. Zernay." Mem. Supp.Mot. at 13 n. 3.

(a) who had employer group health coverage provided by Empire at the time the medical expenses were incurred, and

(b) who on or after March 2, 1989 were denied insurance reimbursement by Empire, or who received less reimbursement than the amounts provided under the groups' primary employer group health insurance plan, based on the fact that they were eligible for Medicare at the time the medical expenses were incurred, and

(c) who have either paid for or still owe their health care providers for the unreimbursed amounts described above.[2]

Plaintiffs assert that some of their claims for benefits were denied by Empire, under both their private Medigap insurance and Medicare, so that they were either forced to pay the costs of their health care themselves or their provider has remained unpaid. Empire has filed third-party complaints against the Klass' former employer, The Jewish Press, Inc., and Mrs. Constantine's former employer, Albert Constantine and Sons, Inc. ("Constantine Sons").

Empire has replied that, while Ms. Zernay's claim was denied in error,[3] its denial of the Klass and Constantine claims on behalf of Medicare and their employers' group health plans was correct because The Jewish Press and Constantine Sons, respectively, had incorrectly enrolled Mrs. Klass and Mrs. Constantine in supplemental (Medigap) health plans. Empire argues that if it is liable to Mrs. Constantine and the estate of Mrs. Klass, then Constantine Sons and The Jewish Press must indemnify Empire because they misrepresented the employment status of the insureds that caused Empire's fault in violation of 42 U.S.C. § 1395y(b)(1)(A)(i) and because these employers were unjustly enriched by their misrepresentation through incurring lower costs

for their group health plan as the result of the misenrollment.

Plaintiffs seek damages from Empire's misenrollment of them in Medigap coverage in violation of 42 U.S.C. § 1935y(b)(1)(A)(i) and its consequent failure to pay or, at least, to pay fully, their health care claims pursuant to the terms of their policies, damages under ERISA, damages for "emotional distress," and lastly, treble damages under N.Y.Gen. Bus.L. § 349(h). Plaintiffs also seek a preliminary injunction "enjoining Empire from continuing to deny insurance reimbursement to the named plaintiffs, and a permanent injunction directing Empire to identify all class members, to make appropriate corrective payments to them ..." Compl. Request for Relief ¶ 5.

For the reasons stated below, a revised class, specified below, is conditionally certified under Fed.R.Civ.P. 23(b)(3) and 23(c)(1).

### Background

#### 1. Medicare Insurance Coverage

Under the law in effect since 1986, after an employee (or the employee's spouse) reaches the age of sixty-five *and* the employee retires from employment, Medicare becomes the retiree's primary payor for health care costs. However, because Medicare does not pay 100 percent of expenses, many retirees choose to purchase additional coverage which is sometimes offered by their former employer. Empire offers such insurance policies to individuals and to employers' group health plans (for retirees) to cover health care costs not covered by Medicare. These policies will be collectively referred to as "Medigap" policies. Medigap becomes the retiree's secondary payer for health care costs, meaning that it pays the amount (or a portion of the amount) not paid or reimbursed by Medicare. Under

---

**2.** This is a plaintiffs' second amended definition of the class. *See* Reply Mem.Supp. at 1 n. 1 and Golick Ltr. dated June 7, 1996. The first definition of the class—"all individuals on Medicare with group health insurance coverage provided by defendant who have been or will be denied insurance reimbursement by defendant because they also have Medicare coverage"—was objected to by Empire as overly broad because it would have included employees in companies with fewer than 20 employees, and retirees, who are not

covered by the Medicare Secondary Payer (MSP) law, 42 U.S.C. § 1395y(b)(1)(A)(i). A district court can revise an overly broad class definition. *Robidoux v. Celani,* 987 F.2d 931, 937 (2d Cir. 1993).

**3.** Empire has acknowledged that it made what it characterizes as a "clerical" error in its enrollment of Ms. Zernay and has paid her disputed claims. Ventriello Aff. dated June 23, 1995 ¶ 22.

present law, Medigap may also be the secondary payor for Medicare-eligible employees of employers with fewer than twenty employees.

When an individual continues working past sixty-five or past the date when his or her covered spouse becomes sixty-five, the Medicare Secondary Payor ("MSP"), 42 U.S.C. § 1395y(b)(1)(A), statute becomes applicable, so long as his employer employs twenty or more employees. MSP requires employers with 20 or more employees to provide active employees and their spouses sixty-five years of age or older the *same* health care benefits as the employer provides to active employees and spouses under sixty-five. At the same time, active employees sixty-five years of age or older are also entitled to Medicare benefits. In such a situation, Medicare becomes the secondary payor for health care costs while any employer-provided plan remains the primary payor. Although employers are not required by the MSP statute to provide any particular level of benefits under their private plans, employers may not take into account the older employees' (or their spouses') entitlement to Medicare benefits in determining the benefits to which those employees are entitled to under the employers' primary plans.

The MSP "working aged" provisions were enacted between 1980 and 1986. Prior to the enactment of MSP, effective in 1983, Medicare was the primary health care payor for all persons over sixty-five, regardless of their employment status. In 1983, Congress adopted the first Medicare Secondary Payer (MSP) provisions applicable to employed individuals (but not their spouses) aged sixty-five through sixty-nine. In 1985 the MSP statute was extended to employees' spouses aged sixty-five through sixty-nine. In 1986 the statute was amended to remove the age-limitation from MSP for both working aged and their spouses.

It may be a curiosity without greater significance, but all of the plaintiffs may have

been unaffected by the first two modifications in the law.[4] That is, all were appropriately enrolled in Medigap coverage from the time they became sixty-five until the law was changed in 1986 to eliminate any age limit for MSP. In 1983, Mrs. Constantine was eighty-one, Ms. Zernay seventy-five, and Mr. Klass was seventy-three, all over its age limit for Medicare secondary status. When the 1986 amendment became effective, Mrs. Constantine was eighty-three, Ms. Zernay seventy-eight, Mr. Klass seventy-six and Mrs. Klass seventy-two.

Plaintiffs have submitted six Explanation of Benefits forms Mrs. Klass or her husband (Mrs. Klass' date of death is not clear from the papers) received from Medicare, three of which paid Medicare primary for portions of her expenses, and three of which denied coverage on grounds that her group health plan was primary. The total for the unpaid bills is $498.42. Pltf. Ex. B. Mrs. Constantine wrote in a May 25, 1994 letter Empire Blue Cross Blue Shield that her unpaid bills exceeded $2,000. Pltf. Ex. C. Plaintiff Zernay's bills exceeded $5,000 and were paid by Empire only after a two year period of repeated denials. Golick Aff. dated March 6, 1995 ¶ 17.

## 2. Widespread Misenrollment of the Working Aged in Empire Medigap Plans

A 1994 audit of Empire's compliance with the MSP law performed by the Office of the Inspector General (OIG) of the United States Department of Health and Human Services found widespread misenrollment of the working aged by Empire in its Medigap plans (or, at least, erroneous processing of claims as Medicare Primary). That report indicated that between January 1, 1983 and November 20, 1989:

> . . . substantial amounts of improper Medicare primary payments were made by [Medicare] contractors when the Empire

---

4. It is not clear whether Mrs. Klass' coverage was through her own employment with the Jewish Press or through her husband's. Mrs. Klass was under seventy in 1980, but MSP did not apply to spouses until the 1985 amendment, at which time she was 71. If Mrs. Klass was covered in her own right as an employee, she should have been enrolled in Medicare secondary coverage after 1980 until she became seventy in 1984, then enrolled under Medigap until the MSP law was changed again in 1986.

private lines of business should have paid primary for these medical services. Using statistical sampling techniques, we estimate that approximately $85 million in improper payments were made during the period January 1, 1983, through November 20, 1989, *for beneficiaries subject to the working-aged criteria of the MSP statute....* This data match identified approximately $2.8 billion in Medicare expenditures for 13 million claims paid for 327,000 individuals meeting the working-aged criteria of the MSP statute and who were part of an Empire EGHP [Employer Group Health Plan].

Ex. A attached to Golick Aff. dated July 18, 1995 at 1–2, 4 (emphasis added).

Empire argues that it has corrected the problem since the OIG report was issued in 1994, that it has always done a competent job of informing employers of the MSP law and that most working-aged individuals covered by the MSP law were correctly insured under primary policies. Empire also claims that it has only received complaints from two other similar situated individuals. It argues that, because of the high cost of health care, if there were other individuals similarly situated, it would have heard from them. Ventriello Aff. dated June 23, 1995, ¶ 19. Finally, Empire argues that given Medicare's "pay and pursue" policy (of which Empire may be expected to have special knowledge, as it was the Medicare processing agent for New York in the relevant period), the situation in which named plaintiffs have been found—being denied *both* Medicare and private insurance—is very unusual.

**3. Empire's Notifications to Employers About MSP Requirements**

From the materials submitted by Empire showing the directions it provided to employers with regard to MSP enrollment, it seems that only in August 1994, following the OIG audit, did Empire require certification by the employer that all enrollees were correctly enrolled in either Medigap or Medicare Primary coverage. Def. Ex. E, attached to Ventriello Aff. dated March 28, 1996. Prior to that date all Empire's efforts, were directed at initial enrollment considerations, with

no directions regarding correction of incorrect enrollment. Some of the early notices are couched in language suggesting that the working aged may "elect" Medicare, with only an off-hand observation that such an election would mean that the employee would have to forego the employer's Medigap coverage as a result. *See* Def. Ex. A.

**a. Empire's 1983 Notification to Employers**

In 1983, Empire wrote employers about MSP provisions: "Employees, age 65 through 69, must be offered in writing the opportunity to elect Medicare or your current group health insurance as primary coverage." Although seeming to stress the "opportunity to elect Medicare," it noted parenthetically, "Although the statute is silent, the new regulations prohibit employers from offering employees affected ... any Medicare supplementary coverage." It also noted:

While 65 to 69 year olds are higher than average users of health care, their subscription rates will not be higher than rates for your other employees, individual or family as the case may be. The impact of adding older employees will, however, affect rates for all community-rated group coverage in future years.

Def. Ex. A.

**b. Empire's 1985 Notification to Employers**

The 1985 amendment required that no Medigap (secondary) coverage be offered to spouses of employees aged 65–69 and that the same coverage be offered to employees' spouses aged 65–69 as to spouses under 65. Empire described this change in a January 23, 1985 letter to employers as follows:

Spouses (ages 65–69) of active employees may now elect group health plan coverage as primary to Medicare even if the active employee has not yet reached age 65.

Previously, the law required employers subject to TEFRA [Tax Equity and Fiscal Responsibility Act—the measure in which the first MSP provisions were enacted] to make available to active employees age 65–69 and their spouses the same group

health plan coverage which was provided for employees under 65. *This change in the law permits spouses ages 65–69 to elect group plan coverage before the active employee reaches age 65 or after age 70.*

Def. Ex. B, emphasis in the original.

The directions to employers continued:

If your group is affected by the amended TEFRA regulations and you have active employees with spouses age 65 through 69 who select your group health plan benefits as primary coverage, the enclosed application card must be completed and returned with your next remittance. . . .

Upon receiving the names of all affected spouses who elect your group coverage as primary, we will advise you if a premium is necessary for this 65 through 69 year old rider. Whether or not a premium increase is necessary, the impact of adding older employees will be reflected in your claims experience and in future subscription rates.

*Id.*

Empire wrote employer group health plan administrators again on July 17, 1985, notifying them of regulations based on the MSP provisions:

The employer's obligation to notify the employees/spouses of their options under [MSP] has decreased. The new rules only require that any brochure or general description about the group health plan provided to employees include a statement or notice indicating that coverage is available to employees and their spouses until age 70 under the same conditions as employees and their spouses under age 65.

It continued:

As in the past, our Accounting Department will continue to send you lists of employees and their spouses who will be reaching ages 65 and 70. As indicated above, those turning 65 who are [MSP] eligible will automatically be continued under your health plan with the same coverage as those under age 65 until the employees or their spouses notify you in writing that

they no longer desire to be covered by your Plan.

*Id.*

### c. Empire's 1990 and 1992 Notifications

Empire has submitted no documentation of any notifications provided group health plan administrators between the dates July 17, 1985 and an otherwise undated 1992 announcement titled "Important Changes for 1992." Ex. C Attached to Ventriello Aff. dated March 28, 1996. Surprisingly, Empire's submissions provide no indication that it made any notification regarding the 1986 MSP change that eliminated, as of May 1, 1986, the MSP upper age limit of seventy. As has been noted, this change appears to have been the change that converted the named individual plaintiffs' enrollments from appropriate Medigap coverage to illegal Medigap coverage. Empire represents that, in 1990, it sent information to plan administrators regarding MSP requirements, but it has not provided a copy of that material to the court.

The first instruction following the 1986 removal of the upper age limit from MSP that Empire has submitted is its 1992 instruction to group administrators entitled: "When a Group Member Reaches Age 65:"

Always be sure your group members are enrolled for the appropriate coverage, For instance, when a member of your group reaches age 65, he or she should be transferred to Medicare carve-out or Medicare Supplement coverage. . . . If your group has 20 or more employees, federal regulations require that actively employed Medicare-eligible members be given the option of choosing their group coverage as their primary insurance, making Medicare the secondary payor. If, instead, these members elect Medicare as their primary insurer, they cannot be covered under your group and must be transferred to a Direct Payment Medicare Supplement policy that cannot be paid for by the group.

Def. Ex. C. Attached to Ventriello Aff. dated March 28, 1996. Before this 1992 notice, Empire appears to have undertaken no effort directed at transferring persons appropriately enrolled in Medigap policies prior to the

changes of the law in 1980, 1985 and 1986, such as the named plaintiffs, to Medicare Secondary coverage. Instead it focused its efforts on instructions to employers regarding appropriate *new* enrollments in Medigap. Again, it is particularly curious that Empire has submitted no communications concerning the elimination of the MSP age limit in 1986.

### d. 1994 Notification and Recertification Request

Empire has submitted a 1994 Eligibility Guideline manual notifying plan administrators that "you must allow your Medicare-eligible active employees to remain on *their current group coverage unless they elect Medicare as their primary coverage.*" Def. Ex. D at III–17; emphasis in original. It also noted that "Empire will assume that a Medicare-eligible active employee is to remain on your group's coverage unless notified that [the employee retired, the employer has fewer than twenty employees or 'the active employee has elected Medicare as his or her primary coverage']." *Id.*

### e. August 1994 Recertification Request

Empire finally addressed the problem of persons incorrectly enrolled in Medigap policies in August 1994 (notably, at the time of the OIG audit) when it required employers and employees to certify the non-employee status of all Medigap enrollees in group health plans offered by employers with twenty or more employees. Its August 17, 1994 letter directly addressed, apparently for the first time, "those instances where your employee was incorrectly enrolled in a Medicare supplementary or carve-out policy while still actively at work...."

Plaintiffs have conceded that Empire's 1994 certification process was an adequate measure:

> If Empire had really wanted to enforce the MSP law, it would have done what it finally did in August, 1994, following the costly debacle precipitated by the OIG investigation—it would have asked employers each year to submit a list of employees and spouses 65 and older who had waived their right to coverage under the group policy and ask whether any current employees or

their spouses were incorrectly enrolled in supplemental policies.

Pltf. Brf dated July 18, 1995 at 6.

Although it is undisputed that, in August 1994, Empire instituted better procedures for informing employers of the MSP program and its secondary nature for active employees and their spouses, it still, according to the OIG audit, violated the MSP statute between 1989 and 1994. Therefore, a substantial number of improper enrollments in the period from 1989 to 1994 are likely. The Empire-administered Medicare "pay and pursue" policy assured payment for the claims of many, possibly most, working aged and their spouses. Nonetheless, a number of the named plaintiffs' claims were not paid by either Medicare or their employer's group health plan, even though it appears that, for many years, many of their claims *were* paid erroneously by Medicare as primary payor.

Here, plaintiffs are requesting damages for all claims unpaid or not fully paid from 1989 to the present. Plaintiffs, however, cannot assert Medicare's rights; they must show that they personally suffered damages as the result of Empire's misenrollments. Effective certification procedures in 1994 may have limited Empire's liability thereafter, but these procedures have had no effect on any pre–1994 misenrollments resulting in full or partial claim denials such as those presented by the named plaintiffs.

### Discussion

In considering whether to certify a class, a district court must assume the truth of the allegations in the complaint. *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 561 (2d Cir.1968), *vac. and remanded on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Ventura v. New York City Health and Hosp. Corp.,* 125 F.R.D. 595, 598 (S.D.N.Y.1989). Plaintiffs, however, bear the burden of establishing that their proposed class meets the requirements of Fed.R.Civ.P. 23 which governs federal class actions. *East Texas Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 405, 97 S.Ct. 1891, 1897–98, 52 L.Ed.2d 453 (1977). Plaintiffs must also satisfy two other requirements, not specified in Rule 23, first, that a definable class must exist and, second, repre-

sentative plaintiffs must be members of the class. 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1759–61 (1986).

### 1. Rule 23(a)(1)—Numerosity and Impracticability of Joinder

The Second Circuit, in *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2nd Cir.1968), summarized the requirements for certification of a class action: "Rule 23 requires a litigant who would bring a class action to overcome two hurdles. First, he must satisfy all the conditions of 23(a) and then he must also convince the court that his action is appropriate under one of the three subdivisions of 23(b)." (Rule 23 was extensively amended in 1966. *Green v. Wolf Corp.* was decided under the revised rule and may represent the Second Circuit's earliest interpretation of the modified rule.)

Fed.R.Civ.P. 23(a) specifies the following prerequisites before a class may be certified:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

A class may be certified only if the class is so numerous that joinder of all members is impracticable.

■ The Inspector General of the Department of Health and Human Services, Pltf. Ex. A, OIG Rpt. attached to Golick July 18, 1995 Reply Aff. at 4, found that 327,000 working aged had been misenrolled with Empire in the period from January 1, 1983 through November 20, 1989. Empire took its first significant action to rectify such misenrollments in August 1994. Thus, although the OIG findings are drawn from an earlier period than this action addresses, it may be inferred that the misenrollment continued until at least late 1994 or early 1995 when the corrections of the August 1994 recertification were in place.

■ The OIG's findings, thus, provide support for the inference of the first prerequisite, numerosity. Although the plaintiffs must reasonably estimate the number of class members, they need not show the exact number. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993). In addition, it is sufficient that the class be defined and capable of identification at some later time. *Folsom v. Blum*, 87 F.R.D. 443, 445 (S.D.N.Y.1980); *Fischer v. Kletz*, 41 F.R.D. 377, 384 (S.D.N.Y.1966).

■ The existence of the class may be found based on reasonable inferences from the OIG findings and the individual plaintiffs' claims experience. Plaintiffs were working aged misenrolled in Empire Medigap policies whose claims for reimbursement from Medicare and from Medigap were denied by Empire in 1993 (Klass and Zernay) and 1994 (Constantine). Plft. Ex. B and C. The named individual plaintiffs are clearly members of the proposed class. The lead plaintiff, Medicare Beneficiaries' Defense Fund (Fund), lacks standing to sue as it is not a Medicare eligible entity and has itself suffered no injury. *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Thus the Fund cannot be a member of the class.

Empire argues that this class does not exist because, after the OIG report was issued, it has done such a good job of informing employers of the MSP law that any enrollment errors must be attributed to employer error. Ventriello Aff. dated March 26, 1996 ¶¶ 11–16. (Empire also argues that the employer alone is responsible for "a group health plan" within the meaning of 42 U.S.C. § 1395y and ERISA, and that, as an insurer of a plan, it is not within the terms of the statute.) In addition, Empire argues that the vast majority of MSP-eligible individuals are correctly enrolled. Def. Brf. dated June 23, 1995 at 11. Empire also claims that it has located only two other individuals similar situated. *Id.* at 17. It has asserted that, because of the high cost of health care, if there were so many other individuals similarly situated, it and the public would have already heard from them. Finally, Empire argues that given Medicare's "pay and pursue" policy, the named plaintiffs' position—being denied

both Medicare and private insurance—is very unusual. *Id.* at 13.

█ Although these arguments possess some merit, they are not wholly persuasive. First, plaintiffs' pleadings must be deemed true. *Ventura,* 125 F.R.D. at 598. *Newberg on Class Actions,* § 3.05 at 141–42, reports that "the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable ..." *See also Korn v. Franchard Corp.,* 456 F.2d 1206, 1209 (2d Cir.1972) (approving certification of a class limited to 70 investors); *Fidelis Corp. v. Litton Indus., Inc.,* 293 F.Supp. 164, 170 (S.D.N.Y.1968) (certifying a class of 35–70 individuals). As pleaded, the individual plaintiffs' claims experience establishes that at least three working aged persons who were misenrolled in Empire Medigap policies in violation of MSP were damaged by that misenrollment. It seems unlikely that all persons similarly situated have been identified.

Plaintiffs have proposed use of an estimating methodology to produce a preliminary estimate of class size. Pltf.Brf. dated July 18, 1995 at 4. Although plaintiffs' original proposal would have applied such a methodology to *all* of Empire's insured, Pltf.Brf. dated March 6, 1995 at 9, this seems excessively speculative. However, at this preliminary stage, if even two one-hundredths of one percent of the 327,000 working aged persons found by the OIG to be incorrectly enrolled suffered damage comparable to that of the three named plaintiffs from that misenrollment, a class of more than sixty persons would exist. That limited number would be more than sufficient to satisfy the numerosity requirement of Rule 23(a) and may be conditionally found, prior to discovery.

Second, the adequacy of Empire's attempts to insure that employers enrolled all MSP-eligible individuals correctly is one of the issues involved in this case. Its submissions intended to document that Empire did all it could to insure correct enrollment are insufficient to defeat this motion for class certification. It is notable that, until the 1994 recertification request was made, the materials submitted by Empire, Def. Ex. A–E, attached to June 23, 1995 and March 28, 1996 Ventriello Aff., never alerted employers to the fact that changes in the MSP statute might have made enrollments in Medigap incorrect despite their having been correct when made. Moreover, the circumstances one finds in connection with the individual plaintiffs' enrollments, and the possibility that, for other reasons, incorrect enrollments might have been made that should have been corrected all lead to the conclusion that the numerosity requirement has been met at least preliminarily.

In fact, the 1994 OIG audit indicated that "the majority of the improper payments [by other Medicare contracted payors] *resulted from the inappropriate sale by Empire* of secondary coverage rather than primary coverage to their customers." OIG Rpt. at 2, Pltf. Ex. A attached to Golick Aff. dated July 18, 1995 (emphasis added). Accordingly, even if, in August 1994, Empire improved procedures for informing employers of the MSP program and the secondary payor role for Medicare, its violations of the statute in the prior period are at issue in this litigation. A reasonable probability exists that a very substantial number of improperly accounted claims and claimants will be found that are similar to those of the named plaintiffs.

It is also true, however, that even though misenrollment was apparently widespread in the period on which the plaintiffs' claims are based, it is not as clear that those misenrolled suffered damages. For so long as Medicare erroneously paid primary benefits, and Empire Medigap under the employers' group health plan paid secondary, those misenrolled suffered no detriment. Empire relies heavily on Medicare's "pay and pursue" policy, Medicare's policy of seeking relief for erroneous payments from the insurer or the group health plan.[5] Def.Brf. dated June 23,

5. Because Empire was the Medicare processing agent in New York, it seems uniquely qualified to describe Medicare practice. Indeed, plaintiffs have argued that this dual role gave Empire both motive and means to effectuate wide-spread violation of the MSP statute by misenrolling the working aged to decrease claims cost, thereby making their health coverage less expensive and

1995 at 13. Yet, in the individual plaintiffs' cases, for at least some of their claims, Medicare did not pay. Thus numerosity is satisfied but only conditionally, to wait upon discovery.

■ The impracticality of joinder of all members is also established conditionally, as the information needed to identify the class members is uniquely within the hands of the defendant. *See Ventura v. New York City Health and Hospitals, Corp.*, 125 F.R.D. 595, 599 (S.D.N.Y.1989) (Walker, J.) ("Plaintiff's lack of knowledge as to the exact number of affected persons is not a bar to maintaining a class action, when defendants have the means to identify those persons at will.") Thus, final determination as to the impracticality of joinder, too, must await discovery. However, the case has the earmarks of "impracticability of joinder," should numerosity be satisfied. *See Green v. Wolf Corp.*, 406 F.2d 291, 296 n. 7 (2d Cir.1968) ("The type of injury which tends to affect simultaneously the interest of many people is also apt to involve immensely complex facts and intricate law, and redress for it is likely to involve expense totally disproportionate to any of the individual claims.") Here the issues regarding Empire's liability are not simple, the individual plaintiffs' damages are, while not trivial sums to them, certainly far less than the cost of litigation. Further, the plaintiffs, by definition are persons of advanced age who required medical care, may be singularly unable to protect their own rights if they had to pursue their claims individually.

### 2. Rule 23(a)(2)—Common Questions of Law and Fact Exist

■ Questions of law and fact common to the class include, first, whether a private right of action by an insured against an insurer of a group health plan was established by the provisions of the Medicare Secondary Payer (MSP) statute. Second, there is also a common question of law with regard to whether Empire is a fiduciary within the terms of ERISA, and if so, whether Empire's directions to employers concerning enrollment criteria adequately discharged such fiduciary duties to the insured.[6]

There may also be a third common question of law as to whether plaintiffs have a cause of action under New York State Gen. Bus.L. § 349(h), supporting the imposition of treble damages to a maximum of $1,000 and attorney's fees. However, the recent decision of the New York Court of Appeals in *New York University v. Continental Insurance Co.*, 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 290, 662 N.E.2d 763 (1995) may suggest that the common answer to the question is that there is no such cause of action. There the court held that, to state a case under § 349(h), plaintiffs "must at the threshold, charge conduct that is consumer oriented." It is not clear on the face that the sale of incorrect group health coverage to an employer is "consumer-oriented" within the meaning of the § 349(h). The *New York University* court continued, "[i]f a plaintiff meets this threshold, its prima facie case may then be established by proving that defendant is engaging in an act or practice that is deceptive in a material way and that plaintiff has been injured by it." However, because the parties have not addressed this issue since the New York Court of Appeals rendered its opinion, this issue will be deferred at this time.[7]

---

thus more competitive. Pltf.Brf. dated July 18, 1995 at 8.

6. With respect to the plaintiffs' ERISA claim, it should be noted that it is likely that subclasses will have to be established, based on exhaustion or non-exhaustion of administrative remedies by a claimant. It is not clear from the materials presented whether the named individual plaintiffs are members of a sub-class of persons who exhausted their administrative remedies, although, in view of the correspondence submitted, it appear to be possible that they did so. Pltf. Ex. C. *See Kenavan v. Empire Blue Cross and*

*Blue Shield*, 1996 WL 14446 *3 (S.D.N.Y. January 16, 1996) ("The Second Circuit ... has required claimants to exhaust their administrative remedies prior to instituting suit in federal court under ERISA.")

7. Still, accepting plaintiffs' argument that the reason for Empire's failure to take the necessary corrective steps was its desire to impose most of the costs on Medicare, rather than on its insureds, *see* n. 3, it is hard to see how Empire's efforts had anything to do with "consumer-oriented" deception within the meaning of § 349.

### 3. Rule 23(a)(3) Claims of the Representatives are Typical of Class

Empire argues that each of the named plaintiffs are atypical of the class. While the bulk of its assertions are without merit, it is correct that the Medicare Beneficiaries' Defense Fund is not a proper class representative or party to this action. (Consideration of Rule 23(a)(2) has been combined with discussion of the predominance of "common questions of law or fact common to the members of the class," under Rule 23(b)(3) because of the overlap in the issues involved.)

#### a. Plaintiff Renee Zernay

 With respect to plaintiff Zernay, Empire argues that its failure to properly pay on her claims resulted from a clerical error, which has since been corrected. Upon learning of that error, Empire has agreed to pay all of her claims for health care benefits that are the subject of this action. Therefore, Empire argues that Zernay no longer has any claims against it, and, therefore, her claim is moot and thus, she is an atypical named plaintiff. Def.Brf. dated June 23, 1995 at 19. This argument should be rejected.

First, the alleged clerical error is, as plaintiffs note, the gravamen of the lawsuit—either an inadvertent or conscious incorrect completion of applications for policies and benefits. Second, the "clerical error" was recognized only five months after this class action was filed, and only after repeated attempts to resolve the matter. According to plaintiffs, the refusal of each attempt to resolve these claims, even after Empire knew or should have known the clerical error existed, demonstrates a culpability on the part of Empire. Empire's settlement of Ms. Zernay's claims came nearly two years from the time it denied her claims in April–May 1993 and *five* months after this suit was filed.

 Third, Empire cannot moot out this class action by providing full relief to a named plaintiff. *See Guaranty National Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980). Even when named representatives' claims have been rendered moot, the claims of unnamed members of the class may remain open, and the named plaintiffs may represent the class. *County of Riverside v. McLaughlin,* 500 U.S. 44, 52, 111 S.Ct. 1661, 1667–68, 114 L.Ed.2d 49 (1991). To allow otherwise would be contrary to the purpose of a class action. *Guaranty National Bank, supra; Comer v. Cisneros,* 37 F.3d 775 (2d Cir.1994) (rejecting buyouts of class representatives). Moreover, even though the bulk of Zernay's claims have been paid, she still has an unresolved claim against Empire for double damages under 42 U.S.C. § 1935y(b)(3)(A). Where a damage claim of an individual named plaintiff is unresolved, that individual retains a sufficient interest in the action to be a class representative. The claims of Zernay alone are sufficient to permit class certification. *Ellis v. Blum,* 643 F.2d 68, 85 (2d Cir.1981) ("The Supreme court, noting the 'flexible character' of the mootness doctrine, has recognized that vigorous advocacy can be assured through means other than the traditional requirement of a 'personal stake in the outcome.'") (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)). Further, even in *In re LILCO Securities Litigation,* 111 F.R.D. 663, 672 (E.D.N.Y. 1986), where one named plaintiff is acceptable as a representative, the fact that other named plaintiffs may be inappropriate does not defeat certification.

#### b. Plaintiff Klass

Plaintiffs have submitted six explanation of benefits statements received by the Klasses for Mrs. Klass' medical care in the period March–November 1992. Three indicate benefits were paid while three indicate denials. Pltf. Ex. B. (Empire has provided no explanation of the inconsistent claims handling demonstrated in these statements, other than to indicate that it has been unable to find all of either the Klasses' or Mrs. Constantine's records.) Ventriello Aff. dated June 23, 1995 ¶ 22 and the single Constantine claim Empire located is attached as Def. Ex. F.

 Empire has argued with respect to plaintiff Mr. Klass, who has sued as the representative of his deceased wife, as it also argues with respect to Mrs. Constantine, that

his "refusal" to attend a deposition establishes that he is an inadequate class representative. The factual basis for the allegation suggests that it is at best incorrect, and at worst contrived. Empire served a notice of deposition on Mr. Klass and Mrs. Constantine with one week's notice, with no prior consultation with opposing counsel, at a time when counsel was out of town. At that point, no discovery had occurred.

Judge Wood dismissed out of hand a similar argument by Empire in *Kenavan*. There Empire claimed that the class representatives would be unable to deposed due to incapacity and age and lack of familiarity with the issues. Judge Wood noted: "In complex cases such as this one, 'named plaintiffs are not required to have expert knowledge of all the details of the case ... and a great deal of reliance on the expertise of counsel is to be expected.'" 1993 WL 128012 at *7 (quoting *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1417 (E.D.N.Y.1989) quoting *In re AM Int'l, Inc. Sec. Litigation*, 108 F.R.D. 190, 196–97 (S.D.N.Y.1985)). In *AM Int'l*, Judge Sprizzo also rejected such an argument, stating: "None of the proposed class representatives suffers from total lack of interest and unfamiliarity with this suit." To require otherwise would insulate Empire from suit by most of its insureds on Medicare, who are, by the very definition of the program, either elderly, disabled, or suffering from End Stage Renal Disease.

#### c. Plaintiff Constantine

■ With respect to Mrs. Constantine, Empire has asserted that she is not a proper class representative for the working aged because the only claim form they have been able to locate indicates that she was "retired" as of October 13, 1993. Accordingly, if this statement is correct, even under plaintiffs' theory that Empire is required to pay claims of actively employed group members who were improperly enrolled in Medigap policies, Mrs. Constantine would have no claim and would not be a member of the class.

The only basis for Empire's assertion that Mrs. Constantine was retired, and was thus not a "working aged" person covered by MSP on October 13, 1993, is a single machine-printed claim form prepared and submitted by a hospital. Def. Ex. F attached to Ventriello Aff. dated June 23, 1995. It is facially obvious that this form was neither prepared nor signed by Mrs. Constantine. This claim form is insufficient to establish Mrs. Constantine's employment status as of that date, as Empire apparently recognized when it refused to pay Medicare primary benefits. In any event, in numerous letters, Mrs. Constantine informed Empire that she did not retire until the Spring of 1994. Pltf. Ex. C. attached to July 18, 1995 Golick Aff.

In the alternative, Empire has argued that because Mrs. Constantine is an owner of Constantine Sons, it has a unique defense in her case because she was responsible for compliance with the MSP program and received financial benefits from the lower costs associated with incorrect enrollment, citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith*, 903 F.2d 176, 180 (2d Cir.1990). The magnitude of the cost differential for Constantine Sons between a correct enrollment and the erroneous enrollment has not been provided by Empire.

In *Gary Plastic*, however, a corporate defendant was disqualified as a class representative because it was subject to the unique defense that it had continued to purchase securities from the defendant even after it was aware of the claimed fraud. Here, however, it is a question of fact whether Mrs. Constantine's ownership interest and role in the corporation is sufficient to ascribe corporate actions to her personal claim. The *Gary Plastic* court observed that "it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification," but rather that class certification only becomes inappropriate where there are "unique defenses which threaten to become the focus of the litigation." *Id.* It does not appear, at this stage, that Mrs. Constantine's ownership interest in Constantine Sons will become a focus of the litigation. If it threatens to do so, it may become appropriate to disqualify her at that time.

In any event, Mrs. Constantine is not the sole class representative proposed and none of Empire's arguments with regard to the other plaintiffs has been credited. Therefore, at least two of the three individual representatives are acceptable class representatives. The question of Empire's unique defenses with regard to Mrs. Constantine's claim may be postponed to await discovery following this conditional class certification.

### d. Other Alleged Inadequacy of Representatives

 Finally, Empire argues that the named plaintiffs are no longer entitled to injunctive relief because they are no longer employed, and, as a result, the MSP are no longer applicable to them. Therefore, Empire claims that the named plaintiffs are no longer entitled to injunctive relief and, therefore, are inadequate to represent the class. This argument is without merit. The fact that a named plaintiff is no longer entitled to future relief is an impermissible basis on which to deny a motion to certify the class. *Robidoux, supra*, 987 F.2d at 931; *Conover v. Montemuro*, 477 F.2d 1073, 1085 (3d Cir. 1972). *See also Sosna v. State of Iowa*, 419 U.S. 393, 402 n. 11, 95 S.Ct. 553, 559 n. 11, 42 L.Ed.2d 532 (1975); *Johnson v. New York State Ed. Dept.*, 409 U.S. 75, 79 n. 7, 93 S.Ct. 259, 261 n. 7, 34 L.Ed.2d 290 (1972); *Rivera v. Freeman*, 469 F.2d 1159, 1163 (9th Cir.

1972); *Gatling v. Butler*, 52 F.R.D. 389, 394–95 (D.Conn.1971).

 In addition, and, perhaps most important here, where the named plaintiffs are of such advanced ages,[8] is that the plaintiffs' attorneys have experience in prosecuting class actions and are capable of prosecuting the action vigorously. *See Ventura v. New York City Health & Hospitals Corp.*, 125 F.R.D. 595, 601 (S.D.N.Y.1989) (Walker, J.). *See also Kenavan*,[9] 1993 WL 128012, *7 (S.D.N.Y. April 19, 1993) ("The court is mindful of the trend to 'assess the adequacy of the plaintiff's attorney rather than the personal qualification of the named plaintiff.'" quoting *Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646, 651 (S.D.N.Y.1986).) The plaintiffs' claims, while typical of working aged persons affected by MSP, are, however, not typical of other recipients of Medicare, that is those qualified for Medicare on the basis of end-stage renal disease or disability. Plaintiffs were, in the relevant period, persons over sixty-five who had qualified for Medicare on the basis of age, who suffered damages from Empire's denial of their claims. All of Empire's notifications to employers dealt with age-related qualification for Medicare. Thus, although the other Medicare categories represent potential subclasses, no evidence has been presented that any persons in these categories were, first, misenrolled and, second, because of such mi-

---

8. The individual plaintiffs' approximate ages are as follows: Mrs. Constantine ninety-three, Ms. Zernay eighty-eight and Mr. Klass eighty-six. Mrs. Klass died prior to the institution of this suit.

9. The certification of a class in *Kenavan v. Empire Blue Cross and Blue Shield*, 1993 WL 128012, at *8 (S.D.N.Y. April 19, 1993), where Empire was the defendant and Medigap coverage (but not MSP) was at the core of the dispute between insured and the insurer, considered many of the issues with regard to class certification that are presented here. As a result it has been referenced frequently in this analysis. In *Kenavan*, Judge Wood certified a class of plaintiffs "who are or were enrolled under any supplemental Medicare insurance policy [Medigap] issued by Empire Blue Cross and Blue Shield and who filed unassigned claims for benefits from March 1, 1986 to December 31, 1992." *Kenavan v. Empire Blue Cross and Blue Shield*, 1993 WL 128012, at *8 (S.D.N.Y. April 19, 1993). *See also*

791 F.Supp. 75 (S.D.N.Y.1992) (finding the terms of its Medigap policy ambiguous with regard to whether insurer or insured bore the cost of a decrease in the Medicare reimbursement rate and that plaintiffs stated an independent cause of action in fraud) and 1996 WL 14446 (January 16, 1996) (granting Empire summary judgment with respect to ERISA claims of the subclass whose members had not exhausted their administrative remedies and remanding their supplemental state claims to state court. The ERISA claims subclass whose members did exhaust their administrative remedy was conditionally dismissed for lack of representation unless a representative intervened within thirty days.)

Empire raised many of the same objections in *Kenavan* as it has raised in this case—lack of numerosity, commonality (under 23(b)(3)), and typicality, inadequate representative capacity, and class manageability. Although the case is not controlling, because of the substantial similarity of the issues presented, *Kenavan* has been considered frequently in this order.

senrollment, subjected to partial or complete denials of claims that would have been paid by Empire had they been correctly enrolled. Thus, although representatives of such subclasses may intervene on an appropriate showing of injury and typicality, there is no basis for even conditional certification of such a class covering persons who qualified for Medicare on bases other than age.

### 4. Rule 23(b)(3) is the Applicable Basis for Certification

In addition to the prerequisites of Rule 23(a), Fed.R.Civ.P. 23(b) requires that class certification satisfy one of the following conditions:

(1) the prosecution of separate actions by or against individual members of the class would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the class ... or (B) adjudications with respect to individual members of the class would be dispositive ... or substantially impair or impede [the] ability of [other members not parties to the suit] to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

■ Plaintiffs characterize the action as one meriting class certification pursuant to Rule 23(b)(2) under which final injunctive or declaratory relief with respect to the class as a whole is sought. This is simply erroneous. As Empire correctly notes, Rule 23(b)(2) is designed for cases in which final injunctive relief is sought rather than monetary damages or, if requested, monetary damages are secondary or ancillary. *See* Newberg § 4.14.

■ Here, because plaintiffs' requests for relief are clearly requests for money dam-

ages resulting from Empire's alleged fault in their misenrollment resulting in its refusal to pay their claims and those of others similarly situated, Rule 23(b)(2) is inapplicable. Plaintiffs' efforts to characterize the relief of damages requested as an injunction ordering Empire to identify class members and calculate and pay them damages simply does not convert the case from one in which certification is appropriate under Rule 23(b)(3) to one under Rule 23(b)(2). Identification of the class members is not *final* relief, but rather an essential part of preparation for trial. Plaintiffs have produced no evidence of an on-going wrong, but evidence, rather, of unredressed past harm. In view of plaintiffs' acknowledgment that Empire adopted reasonable procedures for assuring compliance with MSP in 1994, *see supra* p. 1139, a date prior to their filing this action, it is clear that plaintiffs are seeking damages, not final injunctive relief.

■ As was noted above, in deciding whether to certify a class pursuant to Rule 23(b)(3), district courts have observed that Rules 23(a)(2) and 23(b)(3) should be read in tandem to require that: (1) class members' claims share common questions of law and fact; and (2) the common questions predominate over issues unique to individual class members. *Kenavan v. Empire Blue Cross and Blue Shield*, 1993 WL 128012, at *3 (S.D.N.Y. April 19, 1993) (Wood, J.). Although Empire does not appear to dispute that common questions of law and fact exist in connection with the proposed class, it has argued that these do not predominate over those unique to individual class members.

Empire has argued that the following individual issues predominate in this litigation: (1) each class member would have to establish that the payments which they were denied were covered benefits under their respective plans, including some ERISA plans, requiring interpretation of each plan; (2) the employer group health plans are responsible for compliance with the MSP statute and thus each employer would have to be made a party to the action; (3) Empire's purported acts which misled each group and its members to purchase inappropriate insurance through Empire differ, as does the class

members' reliance on those misrepresentations; (4) knowledge by each class member about the purported misenrollment differs; and (5) levels of damages for each plaintiff differ, in part due to the fact that emotional distress is an alleged component of the damages. Def.Brf. dated June 23, 1995. Based on all of these alleged individual issues, Empire claims the class action would be unmanageable.

Again, Empire's arguments are not persuasive. Although disposition of this action will require the interpretation of several plan documents, notwithstanding some differences in contractual language, the language in all the policies is expected to be substantially similar because of the statutory nature of Medicare and MSP, and the relatively small variations in the terms of the different policies. Thus the commonality prong of Rule 23(b)(3) is satisfied. *See Kenavan,* 1993 WL 128012 at n. 1 ("Although there may be some confusion about the names of the policies in question, there do not appear to be more than three distinct [Medigap] contracts at issue in this case.")

The alleged difference of issues with regard to the nature of the purported misrepresentations, including oral statements, in addition to each class member's knowledge of and reliance on those statements, is insufficient to defeat the commonality requirement of Rule 23(b)(2). *See In re Crazy Eddie Securities Litigation,* 802 F.Supp. 804, 812 (E.D.N.Y.1992); *Kenavan,* 1993 WL 128012 at *4. New York courts have held that reliance may be assumed for the purposes of class certification "subject to such proof as is required on the trial." *Weinberg v. Hertz Corp.,* 116 A.D.2d 1, 499 N.Y.S.2d 693, 696 (1st Dep't 1986), *aff'd on other grounds,* 69 N.Y.2d 979, 516 N.Y.S.2d 652, 509 N.E.2d 347 (1987). In addition, as the different plans are no doubt similar, and the communications to the employers were the same, as is indicated by Empire's own submissions, it is not unreasonable to assume that the alleged misrepresentations were very similar. *See Kenavan, supra.*

■ Further, "[i]t is well-established that individual questions with respect to damages will not defeat class certification or render a proposed representative inadequate unless that issue creates a conflict which goes to the heart of the lawsuit." *In re AM Int'l, Inc. Sec. Litigation,* 108 F.R.D. 190, 196 (S.D.N.Y.1985). Although the level of damages would be different for each plaintiff, they will not be difficult for Empire to determine. Plaintiffs seek double the amount of any improperly denied insurance claims under the MSP statute. Therefore, this case is similar to class actions seeking welfare benefits, where courts have ruled class certification is appropriate even though plaintiffs' damage amounts would vary. *See Rodriguez v. Swank,* 318 F.Supp. 289, 294 (N.D.Ill. 1970), *aff'd,* 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971); *Calkins v. Blum,* 511 F.Supp. 1073, 1088 (N.D.N.Y.1981), *aff'd on other grounds,* 675 F.2d 44 (2d Cir.1982).

■ In addition, the fact that plaintiffs also seek damages for emotional distress should not prevent class certification. *See, e.g., Freeman v. Celebrity Cruises, Inc.,* 1994 WL 689809, 1994 U.S. Dist. LEXIS 17455 (S.D.N.Y.1994). The critical question in the case is Empire's liability. Finally, where parties make both class claims and individual damage claims, the court has the discretion to make appropriate orders such as severance, when necessary. *See Green v. Wolf Corp.,* 406 F.2d 291, 301 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

Despite Empire's claim that the individual employers, not the insurer, were responsible for compliance with the MSP statute, the Department of Health and Human Services Office of the Inspector General determined otherwise and has prevailed in litigation with insurers.[10] Although not legally determina-

---

10. Insurers but not third party administrators have been held liable to the United States Government for claims paid by Medicare that should have been paid by a primary payor. *See Health Insurance Ass'n of America, Inc. v. Shalala,* 23 F.3d 412, 416 (D.C.Cir.1994), *Provident Life and*

*Accident Ins. Co. v. United States,* 740 F.Supp. 492, 502 (E.D.Tenn.1990) ("[Insurer's] argument that the Government's right is limited to an employer or the plan and not the insurer is without merit since both Congress and the Secretary have used the term 'plan' to refer to private

tive of the issue of a private right of action, this finding may be accorded significant weight. In *United States v. Travelers Ins. Co.*, 815 F.Supp. 521, 522 (D.Conn.1992), dealing with the government's right to hold insurers (but not third party administrators) liable for improper Medicare payments under MSP, "[t]he court conclude[d] that the Government has a direct right of recovery against The Travelers pursuant to 42 U.S.C. § 1395y(b) that is separate and distinct from its right of subrogation ..." The OIG Report, at 7, stated:

> It has been Empire's position that compliance with MSP statutes was not its responsibility, but rather the responsibility of HCFA and Empire customers [individual employers].... Notwithstanding these contentions, Federal law and regulations provide that Empire has primary responsibility for compliance with the MSP statute.

Lastly, a class action may be found superior by virtue of the fact that it may be the only way these elderly plaintiffs may obtain redress. As with securities cases, "the dictates of judicial economy and the economic disadvantages of individual suits generally outweigh any interest in individual litigation." Newberg § 4.29.

### 5. Class Definition

As has been discussed above, plaintiffs sought class certification under Fed.R.Civ.P. 23(b)(2). The plaintiffs' proposed class definition for this conditional certification of a class has been amended to incorporate some of Empire's objections and to clarify certain ambiguities. The following class is certified under Rule 23(b)(3):

> All Medicare eligible individuals who incurred or will incur medical expenses while working, or at a time their spouses were working, in group health plans of employers of 20 or more employees covered by the working aged provisions of the Medicare Secondary Payer Program:

> (a) who had employer group health coverage provided by Empire Blue Cross Blue Shield ("Empire") at the time the medical expenses were incurred, and

> (b) who on or after March 2, 1989 were denied insurance reimbursement by Empire, or who received less reimbursement than the amounts provided under the groups' primary employer group health insurance plan, based on the fact that they were eligible for Medicare at the time the medical expenses were incurred, and

> (c) who have either paid the unreimbursed amounts to their health care providers or whose health care providers have not accepted the amounts reimbursed by insurance and/or Medicare as full payment.

Lines 3–5 incorporate Empire's request that the class be limited to persons covered by the working aged provisions of the MSP statute. Plaintiff objects to Empire's proposal on grounds that MSP "also includes individuals (in large group plans) who are on Medicare by virtue of disability, and individuals on Medicare by virtue of having end stage renal disease." This, although true, is not sufficient. The named plaintiffs are not representatives of persons on Medicare on the basis of disability or end stage renal disease. Nor have plaintiffs produced any evidence that any persons on Medicare on a basis other than "working-aged" were misenrolled or were harmed by misenrollment.

Plaintiffs' paragraph (a) has been retained unchanged. Empire offered no specific objection to paragraph (a). Empire's request for the deletion of plaintiffs' definition of the class as including those "who received less reimbursement than the amounts provided under the groups' primary employer group health insurance plan," solely on the ground that this claim was not alleged in the complaint, has been rejected on the basis of the federal liberal pleading rules.

Paragraph (c) (lines 14–17) incorporates Empire's request for the substitution of the

insurance plans sponsored by an employer. Even ERISA makes clear that the proper party defendant in an action to recover benefits is the insurer."); *United States v. Blue Cross and Blue Shield of Michigan*, 726 F.Supp. 1517 (E.D.Mich. 1989) (Granting Blue Cross motion to dismiss

"United States claims against it while acting merely as an administrator of self-insured employer group health plans," and denying the same motion with respect to claims against it in its role as an insurer of an employer group health plan.).

following language for plaintiffs' proposed "or still owe:" "or whose health care providers have not accepted the amounts reimbursed by insurance and/or Medicare as full payment." Empire has argued, and the court accepts, that the phrase "still owe" is vague. Plaintiffs assert in reply that "this revision ... would unnecessarily complicate the class definition and lead to potential problems identifying class members in the future," explaining that they perceive it as adding "an unnecessary inquiry into the provider's subjective intent regarding payment." Golick Ltr. dated June 25, 1996. In fact, provider acceptance should be objectively verifiable from bills showing amounts due that were received and are being received by the class member. The class consists of those who were actually damaged by Empire's actions. Thus, at a minimum, to be a member, the insured must have either paid an amount that should have been reimbursed or have been subjected to claims for its payment by the unreimbursed, or incompletely reimbursed, provider.

### Conclusion

For the foregoing reasons, the class specified above is conditionally certified under Fed.R.Civ.P. 23(b)(3).

SO ORDERED.